UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Gregory A. Scher, | Civ. No. 19-2001 (SRN/BRT) |
| Plaintiff, | |
| v. | |
| Bureau of Prisons; Capt. J. Feda; Lt. Bordt; and FMC Rochester, | **REPORT AND RECOMMENDATION** |
| Defendants. | |

Gregory A. Scher, Reg. No. 00480-122, FMC- Rochester, PO Box 4000, Rochester, MN 55903, *pro se* Plaintiff.

Anna H. Voss, Esq., Assistant United States Attorney, attorney for Defendants.

This matter was referred to the undersigned for the resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. Presently before the Court are Plaintiff Greg Scher's Motion for a Preliminary Injunction (Doc. No. 11) and Request for Adjudication on Motion for Preliminary Injunction (Doc. No. 14). For the reasons that follow, this Court recommends that both be denied.

**I.    Background**

On July 29, 2019, Plaintiff—who is an inmate at Federal Medical Center – Rochester ("FMC-Rochester")—commenced this action alleging that Plaintiff was provided a defective wheelchair, and that Defendants were deliberately indifferent to this problem and denied Plaintiff access to either a powered wheelchair or the wheelchair-assistance program. (Doc. No. 1, Compl. 5.) Plaintiff claims that Defendants' deliberate

indifference resulted in his suffering two hernias, a damaged meniscus, and a torn right rotator cuff, all of which require surgery to correct. (*Id.*)

On October 2, 2019, Plaintiff moved the Court for a preliminary injunction ordering Defendants to provide Plaintiff access to either a powered wheelchair or the wheelchair-assistance program, and to hire contractors to rebuild various ramps that Plaintiff alleges are not compliant with the requirements of the Americans with Disabilities Act and the Rehabilitation Act. (Doc. No. 11, Mot. for Preliminary Inj. 6.) On November 25, 2019, Plaintiff filed a Motion for Adjudication on Motion of Preliminary Injunction, and on January 27, 2020, he filed a Memorandum of Support. (Doc. No. 14, Mot. for Adjudication; Doc. No. 22, Mem. in Support.) On May 22, 2020, Defendants filed their Memorandum in Opposition, and on June 1, 2020, Plaintiff filed a Response. (Doc. No. 47, Mem. in Opp'n; Doc. No. 53, Resp.)

Plaintiff alleges that Defendants issued him a defective wheelchair upon his arrival at FMC-Rochester and that his personal medical devices and clothing were returned to his home. (Compl. 5.) He claims that he attempted on five occasions to exchange the defective wheelchair for one that worked properly, but that his efforts were thwarted by Defendants, who sent him "in a never-ending, time-wasting, circuitous route from one institutional provider to another and back again." (*Id.*) Plaintiff claims that as a result of Defendants' conduct—which he characterizes as "deliberate indifference"—he was unable to make the trip uphill from his housing unit to the mess hall, and as a consequence he was forced to live on "overpriced commissary items." (*Id.*)

Plaintiff further claims that Defendants' failure to replace the allegedly defective wheelchair resulted in Plaintiff suffering "two bilateral inguinal hernias" which he describes as "very painful" and requiring surgery to repair. (*Id.*) Plaintiff also alleges that his attempts at self-propelling his wheelchair with his legs have resulted in damage to the meniscus in his left knee which, again, will require surgery to repair. (*Id.*) In addition, Plaintiff believes that his efforts to propel himself in the allegedly defective wheelchair have resulted in a tear to his right rotator cuff/ACL and claims he has suffered decreased range of movement in his right arm. (*Id.*) Again, Plaintiff claims surgery will be necessary to correct this injury. (*Id.*)

Plaintiff alleges that his medical complaints have been well documented and verified by medical professionals, and that he has "brought these matters to the attention of defendants . . . in an effort to amicably resolve the issues outside of the Court." (*Id.* at 6.) But Plaintiff claims that no one has come to see him about these problems, nor made any effort to alleviate his pain. (*Id.*) Plaintiff suggests that certain Defendants are taking pleasure in his suffering. (*Id.*)

## II. Analysis

"A court issues a preliminary injunction in a lawsuit to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits." *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (per curiam). Preliminary injunctive relief is an extraordinary remedy. *Roudachevski v. All–Am. Care Centers, Inc.*, 648 F.3d 701, 705 (8th Cir. 2011). "Moreover, in the prison context, a request for injunctive relief must always be viewed with great caution because 'judicial

restraint is especially called for in dealing with the complex and intractable problems of prison administration.'" *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995) (quoting *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982)).

A preliminary injunction may be granted only if the moving party can demonstrate: (1) a likelihood of success on the merits; (2) that the movant will suffer irreparable harm absent the restraining order; (3) that the balance of harms favors the movant; and (4) that the public interest favors the movant. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). The party requesting the injunctive relief bears the "complete burden" of proving all the factors listed above. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987); *see also Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). None of these factors by itself is determinative, but "the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied." *D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019) (quoting *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013)).

This Court recommends that Plaintiff's motion for a preliminary injunction be denied because he has failed to demonstrate that he is likely to succeed on the merits of his claims.[1] Defendants characterize the Complaint as asserting only a § 1983 claim for

---

[1] This Court notes that Plaintiff's motion discusses Plaintiff's belief that Defendants have violated the Americans With Disabilities Act and Rehabilitation Act, discriminated against Plaintiff in violation of Title VII and the Fourteenth Amendment, and engaged in a conspiracy under § 1985. (*See* Mot. for Preliminary Inj. 2–5; Mot. for Adjudication 1.) Plaintiff, however, did not plead such claims in his Complaint. (*See* Compl.) The purpose of injunctive relief is to preserve the status quo and prevent irreparable harm until the

4

deliberate indifference to Plaintiff's medical needs, but Plaintiff maintains that Defendants have misconstrued his Complaint, and that he is seeking to bring a personal-injury claim and a medical-malpractice claim. (*See, e.g.*, Reply 2 n.1.) Based upon a careful review, this Court concludes that Plaintiff has failed to establish that he is likely to succeed on the merits of any of those claims, and therefore Plaintiff should not be granted injunctive relief.

### A.     Plaintiff's § 1983 Claim

As explained above, Defendants construe Plaintiff's Complaint as asserting only a § 1983 claim for deliberate indifference to his serious medical needs. Defendants argue that Plaintiff has failed to show that he is likely to succeed on the merits of such a claim because (1) the record demonstrates that Plaintiff failed to exhaust his administrative remedies before pursuing his § 1983 claim as required by the Prison Litigation Reform Act ("PLRA"); and (2) Plaintiff has not shown that Defendants were deliberately indifferent to his serious medical needs. (*See* Mem. in Opp'n.) For the reasons that follow, this Court concludes that Plaintiff has failed to demonstrate that he is likely to succeed on the merits of his § 1983 claim.

---

Court is able to rule on a lawsuit's merits. Accordingly, insofar as Plaintiff seeks injunctive relief under the Americans With Disabilities Act and Rehabilitation Act, Title VII, the Fourteenth Amendment, or § 1985, that request should be denied because Plaintiff has not established the necessary connection between such relief and the claims asserted in his Complaint. *Patterson v. Casalenda*, No. 18-CV-2081 (NEB/SER), 2019 WL 2270609, at *5 (D. Minn. Apr. 23, 2019), *report and recommendation adopted*, No. 18-CV-2081 (NEB/SER), 2019 WL 2267055 (D. Minn. May 28, 2019) (citing *Devose*, 42 F.3d at 471).

### 1. Administrative Remedies

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). This is because the purpose of the PLRA is to reduce the quantity of prisoner lawsuits by giving prison administration an opportunity to take corrective action in response to a prisoner's grievance, thereby avoiding the need for court intercession. *Id.* at 524–25. Prisoners must exhaust administrative remedies even where the relief sought, such as monetary damages, cannot be granted by the administrative process. *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). When a plaintiff fails to exhaust the administrative remedies available to him before filing a lawsuit, "dismissal is mandatory." *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003).

In *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016), the Court clarified that there are no "judge-made" exceptions, such as good cause, to the PLRA's exhaustion requirement. Instead, a prisoner must exhaust all "available" remedies, which the Court narrowly defined as all remedies that are "capable of use." *Id.* at 1858. The Court then emphasized that administrative remedies are "unavailable" only under three limited circumstances which "will not often arise": (1) when the process cannot be completed because it is a

"dead end," with prison officials "unable or consistently unwilling" to provide any relief; (2) when the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) when prison officials thwart the inmate through "machination, misrepresentation, or intimidation." *Id.* at 1859–60.

The Bureau of Prisons ("BOP") has a tiered Administrative Remedy Program for the handling of inmate grievances. *See* 28 C.F.R. §§ 542.10–542.19; (Doc. No. 48, Boldt Decl. ¶¶ 5–6). The first step involves an informal attempt to resolve the problem with prison staff. 28 C.F.R. § 542.13(a); (Boldt Decl. ¶ 7). If an inmate is unable to informally resolve his grievance, he may proceed to the second step – filing a formal Request for Administrative Remedy at the institution in which the inmate is incarcerated. (Boldt Decl. ¶ 7 (citing 28 C.F.R. 542.14).) If, after receiving a response, an inmate is still dissatisfied, he may appeal to the Regional Director within twenty calendar days of the date the Warden signed the response by filing a Regional Office Administrative Remedy Appeal. (*Id.* (citing 28 C.F.R. § 542.15(a)).) If dissatisfied with the Regional Director's response, the inmate can appeal to the Director, National Inmate Appeals, in the Office of the General Counsel in Washington D.C. (*Id.*) An inmate may not raise on appeal an issue not raised in a lower-level filing. (*Id.* (citing 28 C.F.R. § 542.l 5(b)(2)).) Appeal to the Office of the General Counsel is considered the final administrative appeal. (*Id.* ¶ 8 (citing 28 C.F.R.§ 542. l 5(a)).) The Administrative Remedy Program "applies to all inmates in institutions operated by the Bureau of Prisons." (Boldt Decl. ¶ 9 (citing 28 C.F.R. § 542.1O(b)).)

7

The BOP keeps electronic records related to administrative complaints filed by inmates under the Bureau Administrative Remedy Program in a program called SENTRY. (Boldt Decl. ¶ 10.) As of July 29, 2019—the date Plaintiff filed his Complaint—he had not filed any administrative remedy related to the allegations at issue here.[2] (Boldt Decl. ¶ 13, Ex. B.) In December 2019, Plaintiff filed a single grievance related to medical care for his knee, which was subsequently denied. (*See* Doc. No. 23, Pl.'s Exs.) In the denial letter, dated January 21, 2020, the Warden states, "If you are dissatisfied with this response, you may file an appeal with the North Central Regional Director . . . within twenty (20) calendar days of the date of this response." (*Id.* at 2.) There is no evidence in the record that Plaintiff ever appealed that decision.

Here, the record is clear that Plaintiff failed to exhaust his administrative remedies. Plaintiff did not file any formal complaint concerning the claims raised in this lawsuit with the BOP until December 31, 2019, well after filing his Complaint on July 29, 2019, and he failed to pursue that remedy to exhaustion. (Pl.'s Exs. 1–2.; Boldt Decl. ¶ 13, Ex. B; Compl. 1.) In his Reply brief, Plaintiff details what he believes are inadequacies of the BOP's Administrative Remedy Program, but does not dispute Defendants' assertion that he failed to exhaust his administrative remedies. (Reply 3–5.) Plaintiff's dissatisfaction with the structure of the BOP's program and the manner in which Plaintiff believes it to be administered does not excuse him from the PLRA's requirement that he exhaust his administrative remedies prior to pursuing a lawsuit in federal court. The record indicates

---

[2] On or about May 21, 2019, Plaintiff attempted to file Administrative Remedy 978169-F1 at the institutional level, seeking e-mail access. (Boldt Decl., Ex. B 2.)

8

that Plaintiff circumvented the BOP's system for addressing prisoner complaints entirely and is attempting to instead litigate his grievances in federal court. At this stage, however, Plaintiff has not demonstrated that any of the exceptions to the PLRA's exhaustion requirement apply in this case, *see Ross*, 136 S. Ct. at 1859–60, and as a consequence, Plaintiff's § 1983 claim remains subject to dismissal. *Jones*, 340 F.3d at 627.

### 2. Deliberate Indifference

Deliberate indifference to the medical needs of a prisoner can constitute an Eighth Amendment violation. *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). To demonstrate deliberate indifference, Plaintiff must show "(1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Deliberate indifference requires "more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Jolly*, 205 F.3d at 1096 (quotation omitted). Deliberate indifference may be found where "medical care [is] so inappropriate as to evidence intentional maltreatment." *Smith v. Jenkins*, 919 F.2d 90, 92 (8th Cir. 1990). But a prisoner's "mere difference of opinion" regarding how he should have been medically treated fails to rise to the level of a constitutional violation. *Meuir v. Greene Cty. Jail Employees*, 487 F.3d 1115, 1118–19 (8th Cir. 2007) (citation omitted).

### a. Defendants' Evidence Concerning the BOP's Assessment of Plaintiff's Needs

On May 7, 2019, Defendant Daniel Bordt—a physical therapist at FMC-Rochester—performed an assessment of Plaintiff's functional capacity for the wheelchair-pusher program. (Doc. No. 49, Bordt Decl. ¶¶ 1, 6, Ex. A at 1–3.) Plaintiff reported "shortness of breath during gait and using his manual wheelchair." (*Id.* ¶ 6 (citing Ex. A at 1–3).) The evaluation showed that Plaintiff's oxygen saturation level did not drop below 92%, which is not low enough to qualify for the Wheelchair Program. (*Id.*) According to Defendant Bordt, Plaintiff did not report any increase in pain during the evaluation, though he did report fatigue and shortness of breath, and required rest breaks. (*Id.*) Plaintiff was able to cross the compound within ten minutes, and Defendant Bordt concluded that Plaintiff was capable of traversing the area with an assistive device, that Plaintiff could do so even in inclement weather, and that Plaintiff would benefit from a walker with a chair. (*Id.*)

Defendant Bordt also stated that Plaintiff never notified him of problems with a defective wheelchair. (*Id.* at 7.) At the May 7, 2019 evaluation, Defendant Bordt observed that the wheelchair Plaintiff was using was in operating and serviceable condition. (*Id.*) Plaintiff did complain about his wheelchair pulling to one side during a visit to Health Services on June 10, 2019, and Physical Therapy issued Plaintiff a new wheelchair the following day. (*Id.* ¶ 7, Ex. A at 44.) And when Defendant Bordt next saw Plaintiff on July 31, 2019, Plaintiff did not complain about his wheelchair. (*Id.* ¶ 7.) Defendant Bordt saw Plaintiff propelling himself on August 9, 2019, and that the

10

wheelchair he was using appeared to be in good, serviceable condition. (*Id.* ¶ 7, Ex. A at 12.)

The BOP has guidelines for the issuance of powered wheelchairs. (Doc. No. 50, Feda Decl. ¶ 6, Exs. B.) The decision to issue such a device is based on an individual mobility/wheelchair seating assessment when an inmate suffers from (1) quadriplegia, (2) paraplegia with at least one upper extremity deemed non-functional due to other neuromuscular pathologies, (3) significant impairment of the cardiovascular system such that the patient is unable to maintain blood-oxygen saturation levels at 85% or greater with the use of another mobility assistive device and supplemental oxygen, (4) bilateral above-the-knee amputation with upper extremity pathology, and/or (5) progressive neurological muscular disease. (*Id.*, Ex. B ¶ 2.) Captain Jessica Feda, Director of Physical Therapy at FMC-Rochester, states that Plaintiff was not issued a powered wheelchair because he did not meet these requirements. (*Id.* ¶ 7.)

### b. Defendants' Evidence Concerning the Treatment of Plaintiff's Injuries

Plaintiff reported groin pain in June 2019. (Doc. No. 51, Morgan Decl. ¶ 5.) An ultrasound revealed bilateral fat containing reducible direct inguinal hernias. (*Id.*) An abdominal binder and truss were recommended, but proved ineffective. (*Id.*; Feda Decl. ¶ 12.) Plaintiff was then evaluated by an outside provider for surgery, who recommended the Plaintiff undergo laparoscopic hernia repair after pulmonary function tests, Pulmonary clinic evaluation, and an infective disease workup was completed. (Morgan Decl. ¶ 5.) Plaintiff was cleared for surgery on November 12, 2019, with surgery to occur

in January 2020. (*Id.*) However, on December 20, 2019, the cardiology department saw Plaintiff for a cardiovascular risk assessment and recommended a stress echocardiogram and a Holter monitor due to symptoms Plaintiff had reported. (*Id.*) The Holter was completed on January 2, 2020, and the echocardiogram was completed on February 26, 2020 – both were "reassuring." (*Id.*) COVID-19 restrictions further delayed the scheduling of Plaintiff's surgery, but it appears that Plaintiff "has been rescheduled for hernia surgery which should occur in the near future." (*Id.*; Feda Decl. ¶ 11.)

On June 10, 2019, Plaintiff reported pain in his left knee. (Feda Decl. ¶ 14, Ex. A at 260.) An X-Ray showed mild narrowing of the medial compartment, but no significant degenerative changes, and no evidence of knee-joint effusion. (*Id.* ¶ 14, Ex. A at 386.) Plaintiff saw Defendant Bordt about his left-knee pain on August 9, 2019, but declined evaluation and treatment for his knee at that time. (Bordt Decl. ¶ 9, Ex. A at 12.) Plaintiff saw Defendant Bordt again about his knee on September 24, 2019, and an evaluation demonstrated that Plaintiff's gait was normal, palpation of his left knee was normal, he had normal strength in his lower extremities, and that he could only squat half-way down due to hernia—not knee—pain. (*Id.* ¶ 9, Ex. A at 14–17, 45.) Plaintiff did, however, have limited range of movement with pain in his left knee, and rated that pain at 3 out of 10. (*Id.*)

Defendant Bordt assessed that Plaintiff was suffering from a musculoskeletal impairment associated with connective tissue dysfunction, and testing indicated a possible mild meniscal lesion. (*Id.*) Plaintiff was subsequently entered into a course of physical therapy with Defendant Bordt that ultimately involved exercises, laser treatment

12

of the left knee, and a steroid injection into the left knee. (*Id.* ¶ 10, Ex. A at 34–35.) On November 1, 2019, Plaintiff reported no further pain since the steroid objection, and asked to be discharged from physical therapy.[3] (*Id.* ¶ 10, Ex. A at 19.) On January 10, 2020, Plaintiff again saw Defendant Bordt, reported no further pain in his knee, and again asked to be discharged from physical therapy. (*Id.* ¶ 10, Ex. A at 20.) Examination revealed Plaintiff had excellent range of motion, strength, and ability to transfer, and Plaintiff was discharged from physical therapy per his request. (*Id.*, Ex. A at 21.) Plaintiff received subsequent steroid injections, the most recent occurring on February 11, 2020. (Feda Decl., Ex. A at 31–35.)

Plaintiff reported pain and popping in his right shoulder on July 17, 2019. (Feda Decl. ¶ 15, Ex. A at 207–09.) On July 31, 2019, Plaintiff was seen by physical therapy and again reported pain in his shoulder. (*Id.*, Ex. A at 188–89.) That examination found that he has a musculoskeletal impairment associated with localized information, and that he should self-manage the issue by limiting his activity and using protection, rest, ice, compression, and elevation. (*Id.*) Plaintiff did not complain of the issue again, and the only radiological evidence in the medical record is an X-Ray of Plaintiff's shoulder from December 6, 2018, which appears normal. (*Id.*, Ex. A at 269.)

---

[3]   This Court notes that the effectiveness of the steroid treatment in alleviating Plaintiff's knee pain is corroborated by statements in Plaintiff's own exhibits. (*See* Doc. No. 25, Pick Decl. 3; Doc. No. 26, Chevchuc Decl. 2.)

### c. Plaintiff has Failed to Demonstrate a Likelihood of Success on the Merits on the § 1983 Claim

Here, Plaintiff has thus far failed to demonstrate that he is likely to prevail on his claim that Defendants were deliberately indifferent to his serious medical needs. First, Plaintiff claims that he should have been enrolled in the wheelchair-assistance program or provided a powered wheelchair, but the record demonstrates that Plaintiff did not meet the eligibility requirements for either. (Feda Decl. ¶ 7; Bordt Decl. ¶ 6.) In his Reply, Plaintiff asserts that Defendants Feda and Bordt were dishonest in their affidavits, and Plaintiff questions whether they are qualified to evaluate his medical needs. (Reply 5–9.) Plaintiff draws the Court's attention to an overnight oximetry report completed on a CPAP machine, apparently while Plaintiff was sleeping, that recorded Plaintiff's oxygen saturation between 86 and 92%. (Reply 6; Feda Decl., Ex. A at 392–96.) But Plaintiff has not identified any evidence that contradicts the May 7, 2019 evaluation for the wheelchair-assistance program showing that his oxygen saturation levels did not drop below 92% *while ambulating*. (Bordt Decl. ¶ 6, Ex. A 1–3.) In fact, Plaintiff's medical record includes a report of a similar test, conducted on August 14, 2018 at Castle Medical Center, that similarly found "[n]o significant oxygen desaturation in response to ambulatory exercise" and measured Plaintiff's oxygen saturation levels at between 97 and 100% "throughout the entire period of rest, ambulatory exercise and recovery." (Feda Decl., Ex. A at 390–91.)

When seeking injunctive relief, it is Plaintiff's complete burden to demonstrate that he is likely to succeed on the merits of his case, *Watkins, Inc.*, 346 F.3d at 844. Here,

14

Plaintiff has made it very clear that he disagrees with the judgment of Defendants, but Plaintiff's disagreement with the DOC's policies and the judgment of medical professionals, without more, does not rise to the level of a constitutional violation. *Meuir*, 487 F.3d 1118–19. Accordingly, this Court concludes that Plaintiff has so far failed to demonstrate that Defendants' decision not to enroll Plaintiff in the wheelchair-assistance program or provide him with a powered wheelchair constituted deliberate indifference to his serious medical needs.

Second, Plaintiff's medical record demonstrates that he has been treated consistently for his various ailments. When Plaintiff complained about his wheelchair, it was replaced a day later.[4] (Bordt Decl. ¶ 7, Ex. A at 44.) When Plaintiff complained of pain in his groin, he was examined, diagnosed with a hernia, treated, and eventually scheduled for surgery. (Morgan Decl. ¶ 5; Feda Decl. ¶¶ 11–12.) It is true that Plaintiff's surgery has been delayed, but that was due to concerns over his own health and restrictions put in place to slow the spread of COVID-19, not due to dilatory conduct on the part of Defendants. (Morgan Decl. ¶ 5.) Plaintiff's medical history also demonstrates that he was treated successfully for pain in his left knee and that he was also evaluated for pain in his right shoulder. (Bordt ¶ 10, Ex. A at 19–20; Feda Decl. ¶ 15, Ex. A at 188–89, 207–09.) This Court observes that Plaintiff's medical records do not support his assertions that the injuries to his left knee and right shoulder require surgery to repair.

---

[4]   Plaintiff notes that he was actually issued three separate wheelchairs. (Reply 7–8 (citing Feda Decl., Ex. A at 340, 365).) Plaintiff does not claim, however, that he was ever denied a wheelchair.

In sum, there is insufficient evidence in the record at this time to show that Defendants' treatment of Plaintiff rose to the level of deliberate indifference. Again, it is clear that Plaintiff disagrees with both Defendants' diagnoses of his ailments as well as some of the treatments he has been given, but this disagreement, without more, is insufficient to demonstrate deliberate indifference to his serious medical needs. *Jolly*, 205 F.3d at 1096. Accordingly, this Court concludes that Plaintiff has so far failed to demonstrate that he is likely to prevail on the merits on his § 1983 claim for deliberate difference to Plaintiff's serious medical needs against any of the Defendants' in this action.[5]

## B.     Plaintiff's Tort Claims

As discussed above, Plaintiff maintains that Defendants have misconstrued his Complaint, and that he is seeking to bring a personal-injury claim and a medical-

---

[5] Defendants also argue that Defendants Feda and Bordt will likely be entitled to qualified immunity as to Plaintiff's § 1983 claim. "Qualified immunity shields government officials from liability unless the conduct violates clearly established statutory or constitutional rights of which a reasonable person would know." *Ferguson v. Short*, 840 F.3d 508, 510 (8th Cir. 2016). When analyzing a claim of qualified immunity, Courts examine "(1) whether the facts alleged or shown, construed most favorably to the plaintiffs, establish a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged misconduct, such that a reasonable official would have known that the acts were unlawful." *Small v. McCrystal*, 708 F.3d 997, 1003 (8th Cir. 2013).

Here, Defendants Feda and Bordt—both government officials—will be shielded from liability in their individual capacities by qualified immunity unless Plaintiff can demonstrate that they violated his clearly established constitutional rights. As explained above, this Court concludes that as of this writing, Plaintiff has so far failed to demonstrate that he is likely to prevail on his § 1983 claim for deliberate indifference to his serious medical needs. If that remains unchanged, it is likely that the Court will conclude that Defendants Feda and Bordt are entitled to qualified immunity.

16

malpractice claim. (*See, e.g.*, Reply 2 n.1.) Based on the record, however, this Court, concludes that Plaintiff has failed to demonstrate a likelihood of success on the merits with regard to those claims as well.

### 1. Medical Malpractice

To the extent that Plaintiff wishes to bring a claim for medical malpractice, he has failed to carry his burden to demonstrate that he is likely to prevail on such a claim. Medical malpractice claims under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, et seq., "are governed under the substantive law of the state in which the claims arose." 28 U.S.C. § 1346(b); *Tineo v. Fed. Bureau of Prisons*, No. CIV.05-724 ADM/SRN, 2005 WL 1745451, at *2 (D. Minn. July 22, 2005). Here, the events underlying Plaintiff's claim occurred in Minnesota, and thus Minnesota law applies. Medical malpractice claims in Minnesota are governed by Minn. Stat. § 145.682. *Tineo*, 2005 WL 1745451, at *2 (citing *Oslund v. United States*, 701 F. Supp. 710, 713–14 (D. Minn. 1988); *Bellecourt v. United States*, 784 F. Supp. 623, 635–37 (D. Minn. 1992), *aff'd* 994 F.2d 427 (8th Cir. 1993)). That statute requires the plaintiff in a medical malpractice action to furnish two affidavits in support of his claims. One of them, the "expert review affidavit":

> must be submitted with the complaint and state that before commencing the lawsuit, plaintiff's attorney reviewed the facts of the case with a medical expert who believed that at least one defendant named in the suit deviated from the applicable standard of care and thereby injured the plaintiff . . . .

*Bellecourt*, 784 F.Supp. at 636 (citing Minn. Stat. § 145.682, subd. 3(a)).

The consequence of failing to comply with the affidavit requirement is dismissal of the complaint with prejudice. *Flores v. United States*, 689 F.3d 894, 900 (8th Cir.

2012) (citing Minn. Stat. § 145.682, subd. 6.). A plaintiff can avoid dismissal in such circumstances only where: "(1) expert testimony is not needed to establish negligence; or (2) if the plaintiff shows excusable neglect in failing to timely serve the affidavits." *Flores*, 689 F.3d at 900 (citing Minn. Stat. § 145.682 subds. 2, 4; *Stern v. Dill*, 442 N.W.2d 322, 324 (Minn. 1989)).

Here, Plaintiff did not furnish an expert affidavit with his Complaint, as required by § 145.682, nor has Plaintiff argued that such testimony is unnecessary in this case, or that his failure to provide the affidavit was due to excusable neglect. Accordingly, because Plaintiff has failed to provide such an affidavit, it appears likely at this time that he will not prevail on a medical malpractice claim as to any Defendants.

### 2. Personal Injury Claim

To the extent Plaintiff wishes to assert a personal-injury claim, Plaintiff has also failed to demonstrate that he is likely to prevail upon such a claim at this time. To succeed in a personal-injury claim in Minnesota based on Defendants' negligence, "a plaintiff must prove injury and a causal connection between the injury and the event sued upon." *Stewart v. Norcold, Inc.*, No. 18-CV-2114 (NEB/DTS), 2020 WL 1244787, at *7 (D. Minn. Mar. 16, 2020) (citing *In re Baycol Prods. Litig.*, 321 F. Supp. 2d 1118, 1124–25 (D. Minn. 2004) (citation omitted)). While expert medical testimony is not required in every personal injury action,

> where a question involves "obscure and abstruse medical factors such that the ordinary layman cannot reasonably possess well-founded knowledge of the matter and could only indulge in speculation," there must be expert testimony "that the thing alleged to have caused the result not only might have caused it but in fact did cause it."

*Stewart*, 2020 WL 1244787, at *7 (quoting *Gross v. Victoria Station Farms, Inc.*, 578 N.W.2d 757, 762 (Minn. 1998) (citation omitted)).

Here, Plaintiff claims that Defendants' decisions as to the medical treatment and mobility assistance Plaintiff received at FMC-Rochester resulted in three distinct injuries. These are complex medical claims "requiring expert (as opposed to lay) testimony regarding diagnosis and causation." *Hahn v. Minn. Beef Indus., Inc.*, No. 00-CV-2282 (RHK/SRN), 2002 WL 32658476, at *3 (D. Minn. May 29, 2002); *see also Willert v. Ortho Pharm. Corp.*, 995 F. Supp. 979, 983 (D. Minn. 1998) (granting summary judgment for failure to prove causation after excluding expert testimony where plaintiff claimed that medicine caused his injury). To date, Plaintiff has offered no expert testimony, nor any other medical evidence, connecting his alleged injuries to Defendants' actions. Ultimately, Plaintiff's lay assertions concerning the causes of his alleged injuries are insufficient to maintain a personal-injury claim. Accordingly, this Court concludes that based on the record before it, it is likely that Plaintiff's personal-injury claim will be dismissed as to all Defendants.

### C. Other *Dataphase* Factors

Where a Plaintiff has failed to demonstrate a likelihood of success on the merits, there is little justification for granting a preliminary injunction. *See Barrett v. Claycomb*, 705 F.3d 315, 325 (8th Cir. 2013) (ending a *Dataphase* analysis after finding there was no likelihood of success on the merits); *Oglala Sioux Tribe v. C & W Enters., Inc.*, 542

F.3d 224, 233 (8th Cir. 2008) (same). Accordingly, this Court finds it unnecessary to analyze the remaining *Dataphase* factors under the present circumstances.

### III. Conclusion

For the foregoing reasons, this Court recommends that Plaintiff's Motion for a Preliminary Injunction and Request for Adjudication on Motion for Preliminary Injunction be denied.

### RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for a Preliminary Injunction (Doc. No. 11) be **DENIED**; and

2. Plaintiff's Request for Adjudication on Motion for Preliminary Injunction (Doc. No. 14) be **DENIED**.

Date:  July 1, 2020

*s/ Becky R. Thorson*
BECKY R. THORSON
United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Pursuant to Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report within **fourteen (14) days**. A party may respond to those objections within **fourteen (14) days** after service thereof. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).